FILED

ⒿUL 3 0 2021

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH LYNN GETCHMAN, on behalf of The UNITED STATES OF AMERICA | ) ) ) ) | **4:21-cv-00951 JMB** |
| Plaintiff/Relator, | ) ) | |
| vs. | ) ) | Cause No. |
| FISERV SOLUTIONS, LLC, and | ) ) | JURY TRIAL DEMANDED E.D. Mo Local Rule 2.04 |
| FISERV, INC. | ) ) | |
| Defendants. | ) ) | |

## FALSE CLAIMS ACT COMPLAINT

COMES NOW The United States of America ("Plaintiff"), by and through *qui tam* relator

Deborah Lynn Getchman ("Relator"), and for its Complaint against Fiserv, Inc. and Fiserv

Solutions, LLC (collectively "Defendants" or "Fiserv") for damages, penalties and other relief

pursuant to the False Claims Act (31 U.S.C. §§ 3729-3732), states as follows:

## NATURE OF THE ACTION

This action is brought to recover damages to the United States of America from Fiserv's

pattern and practice of claiming improper postal rate discounts resulting in massive underpayment

of fees owed to the United States Postal Service ("USPS").  USPS provides mail service

throughout the United States at regulated and standard rates.  Postage discounts are available for

certain types of mail, including presorted mail certified to comply with "Move Update" standards

established by USPS to reduce costs associated with undeliverable mail.  The Move Update

standards may be met through different mechanisms including use of USPS's NCOA^Link system,

which allows system licensees to verify and update mailing list information using data contained

in the USPS's National Change of Address ("NCOA") database. Users of the NCOA$^{Link}$ system must follow certain guidelines and processes to meet USPS requirements and the Privacy Act of 1974 to be compliant with Move Update standards. These requirements include, but are not limited to, obtaining and annually updating a Processing Acknowledgment Form ("PAF") from every client using NCOA$^{Link}$ information prior to accessing such data and updating mailing list information using the data obtained. Fiserv knowingly and flagrantly failed to comply with MovUpdate standards and NCOA$^{Link}$ requirements and were, therefore, ineligible for bulk and presorted mail discounts. Nonetheless, Fiserv claimed and/or caused their mailing vendors to claim on their behalf millions of dollars of mailing rate discounts. Fiserv maintained those costsavings as profits. Relator seeks damages on behalf of the United States of America together with civil penalties and fees and costs pursuant to the False Claims Act.

## PARTIES

1.      Relator is an individual and United States citizen residing in Franklin County, Missouri.

2.      Defendant Fiserv Solutions, LLC ("Fiserv Solutions") is a Wisconsin limited liability company with its principal place of business located at 255 Fiserv Drive, Brookfield, Wisconsin, 53045. Upon information and belief, Fiserv Solutions is a wholly owned subsidiary of Fiserv, Inc. Fiserv Solutions' registered agent in Missouri is CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, MO 65101.

3.      Defendant Fiserv, Inc. ("Fiserv, Inc") is a Wisconsin corporation with its principal place of business located at 255 Fiserv Drive, Brookfield, Wisconsin, 53045. Fiserv, Inc. has no Missouri registered agent. Upon information and belief, Fiserv, Inc. exercises dominion and

2

control over, and is a parent company and/or affiliate of, Fiserv Solutions, LLC, having ownership

of Fiserv Solutions, control of Fiserv Solutions and/or the right to control Fiserv Solutions.

## JURISDICTION AND VENUE

4.    Jurisdiction exists in this Court pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

5.    Venue is proper in this Court under 31 U.S.C. § 3732(a) because Defendants, and

each of them jointly and severally acting individually and collectively conducted business—

including but not limited to providing, overseeing and/or controling bulk mailing services—and/or

performed acts proscribed by the False Claims Act within this judicial district.

6.    Relator is the original source of and has direct knowledge of all publicly disclosed

information providing the basis for the allegations herein.  Relator has personally gathered all

documents and information supporting these allegations.  Relator voluntarily provided this

information to the government.

## FACTUAL ALLEGATIONS

### A. The United States Postal System

7.    USPS is an independent establishment of the executive branch of the United States

Government formed pursuant to the Postal Reorganization Act of 1970.

8.    USPS is tasked to "plan, develop, promote and provide adequate and efficient

postal services at fair and reasonable rates and fees."  39 U.S.C. § 403(a).

9.    USPS publishes its rules, regulations and rates in its Domestic Mail Manual

("D.M.M."), which is incorporated by reference into the Code of Federal Regulations.  See 39

C.F.R. § 111.1(a).

10.    USPS divides mail into various classes and categories depending on certain

characteristics related to size, weight, contents and other processing attributes.  For example, bills

and statements of account or mail containing personal information (i.e. information specific to the addressee) must be mailed as First-Class Mail, Priority Mail, or Priority Mail Express. D.M.M. 233.2.2-3. The requirements and rates for each class of mail are set forth in the D.M.M.

11.     Except as specifically authorized, USPS may not "make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user" related to rates and fees. 39 U.S.C. § 403(c).

12.     However, "workshare discounts" may be provided to reduce rates for mailers that provide certain services that result in economic efficiencies for USPS including presorting, pre-barcoding, handling or transportation of mail. The requirements to be eligible for such discounts are set forth in the D.M.M.

13.     "To the extent that postage prices, fees for mail services and basic mail classification and eligibility are prescribed by federal statute or the Domestic Mail Classification Schedule, the USPS is not authorized to waive or except the corresponding DMM standards." D.M.M. 607.1.2.

**B. Commercial Mail Discounts and the Move Update Standard**

14.     Approximately 40 million people in the United States change their addresses in a typical year.   Large volumes of undeliverable mail due to outdated postal addresses can significantly increase the expenses and inefficiency of postal operations.

15.     USPS has addressed potential costs and inefficiencies related to undeliverable mail, in part, by incentivizing commercial mailers to reduce undeliverable mail.  Commercial mailers may obtain workshare discounts to standard mail rates for meeting certain criteria related to, among other things, pre-sorting and address quality.

4

16.    The USPS "Move Update" standard is an address quality tool designed to minimize undeliverable and discarded mail by allowing mailers to keep mailing lists current so that customers may be reached after they move.

17.    In 1984, USPS developed the National Change of Address System ("NCOA"). That system allows postal customers to notify USPS of a temporary or permanent address change so that mail may be properly routed, and undeliverable mail reduced.

18.    The Move Update standard requires that mailers periodically match their address records with NCOA information using certain approved methods or be preapproved for certain other limited alternative methods to meet the standards.  To meet the Move Update standard, such reconciliation of customer mailing lists must be done within 95 days prior to mailing.

19.    In 2003, USPS introduced NCOA$^{\text{Link}}$ as a tool for licensed users to use the NCOA database to update mailing lists.  NCOA$^{\text{Link}}$ is an approved method of meeting the Move Update standard.

20.    NCOA$^{\text{Link}}$ is a database product that securely processes and updates mailing lists using change-of-address information contained in the NCOA.  The NCOA$^{\text{Link}}$ product is licensed by USPS to service providers who update mailing lists owned by unrelated third parties (each a "Licensee") as well as directly to some end-user mailing list owners.

21.    Information provided by USPS customers through the NCOA is subject to protection under the Privacy Act of 1974, and may not be disclosed except for authorized purposes. As a result, those accessing NCOA$^{\text{Link}}$ are required to provide certain information through a Processing Acknowledgement Form ("PAF").

22.    Prior to processing any mailing list through NCOA$^{\text{Link}}$, and annually thereafter, the Licensee must have a fully executed PAF related to that specific mailing list customer.

5

Alternatively, the Licensee may collect PAF information using an "Equivalent Alternative PAF Method" and/or annually renew PAFs using an "Alternative PAF Renewal Policy." To be complete, the PAF must be filled out and signed by (or the Alternative PAF information gathered for) the NCOA[Link] Licensee, the mailing list owner and any third parties that are part of the transaction between the Licensee and list owner including any broker, administrator or custodian. The agreements between Licensees and USPS expressly provides that "[u]nder no circumstances shall a third-party Broker, Agent or List Administrator be considered the mailing list owner nor those the authority to sign on behalf of the Mailing List owner." *See* NCOA[Link] Full Service Provider Licensee Performance Requirements, Version 35 dated January 26, 2016 at § 9.3.1.

23.    According to the USPS Processing Acknowledgment Form (PAF) Guide, "[t]he PAF is an essential part of the NCOA[Link] system." Processing Acknowledgment Form (PAF) Guide, United States Postal Service, National Customer Support Center (NCSC), December 19, 2018 at p. 5.

24.    The PAF is required to comply with the Privacy Act of 1974. It serves, among other things, to meet the USPS's obligation to identify mailers for whom it has disclosed change-of-address information and ensures that mailers and list owners acknowledge the use restrictions for NCOA data.

25.    PAFs must be maintained and kept on file for a period of six years.

26.    In addition, each mailing list owner must be provided with a NCOA[Link] Information Package, which it certifies it has been provided as part of the PAF.

27.    Change-of-address information obtained from NCOA[Link] is intended to be used to update mailing list addresses prior to mailing and serves as the basis for claiming compliance with the Move Update standards.

28.     The NCOA[Link] product provides a number of report outputs including processing summary reports and individual file level information, including information related to addresses that were matched in the NCOA system.

29.     Any mailing claiming a discount must be manifested using the USPS electronic verification system or be accompanied by a postage statement completed and signed by the mailer. D.M.M. 203.1.1. "The mailer's signature on the postage statement or electronic confirmation during eDoc submission certifies that the Move Update standard has been met for the address records, including each address in the corresponding mailing presented to the Postal Service." D.M.M. 602.5.4

30.     The first-class mail Postage Statement form (Form 3600-FCM), for example, includes a certification that, among other things, "all information furnished . . . is accurate, truthful and complete" and "the mailing qualifies for the prices and fees claimed."

### C. Fiserv, Inc.'s Bulk Mail Business Model

31.     Fiserv, Inc. is a global Fortune 500 and S&P 500 organization which provides software services and business solutions to various clients directly and through numerous subsidiaries. At all times relevant herein Fiserv, Inc. operated by and through itself, its affiliates, subsidiaries, agents, and employees, including but not limited to Fiserv Solutions, LLC.

32.     Fiserv contracts to provide services with clients through a form of Master Agreement executed on by Fiserv Solutions, LLC. Per the Master Agreement, services are provided directly by Fiserv Solutions, LLC and through its affiliates. Fiserv, Inc., its affiliates, subsidiaries, agents, and employees provide and/or participate in providing services to clients.

33.     Fiserv's Output Solutions division provides consumer communication and card production solutions. Those services are provided through four vertical segments:    Print,

Statement Advantage, Healthcare and Plastics.  The print segment distributes mail for customers, the majority of which includes personal identifying information, such as automobile lease invoices and utility bills.  The Statement Advantage segment provides mailing services to financial services companies including mailing of account statements.  The Healthcare segment distributes health care mailings including plan documents, insurance cards and explanation of benefits mailings.  The Plastics segment prepares and mails debit and credit cards. Given the character of these mailings and the NCOA, Fiserv's mailing list owner customers, the intended mail recipients using address change forms, and the USPS all have a clear and valuable interest in and expectation of both privacy, timely delivery, and accuracy of the mailings entered into the mail-stream by Fiserv.

34.    Fiserv has a particular emphasis on serving the financial industry, including some of the largest banks and financial services companies in the United States.

35.    Fiserv operates multiple facilities in the United States to produce and distribute mailings over a vast geographic area and, with particularly, throughout this judicial district.  It currently operates a mailing facility in Hazelwood, Missouri.  It also currently operates or has recently operated mailing facilities in at least the following general locations: Wallingford, Connecticut; Walnut, California; Indianapolis, Indiana; Houston, Texas and Kent, Ohio.  Fiserv operates a Plastics segment mailing operation in Shoreview, Minnesota.

36.    As part of the production fulfillment service, Fiserv obtains electronic files from clients including both the customer mailing list and the materials to be produced and mailed. Fiserv promotes to clients and potential clients that they check addresses against change-of-address records as part of its "Address Optimization" service.

37.    Fiserv contracts with numerous third-party companies that are Licensees of the NCOA[Link] Product to provide matching service.  Most customer lists are processed through the

8

NCOA$^{\text{Link}}$ system through the Licensees. For items mailed through the Plastics service, however, processing is done within the Fiserv system using information from a Licensee as the data may not be sent outside of Fiserv firewalls due to its sensitive nature.

38.    Fiserv subsequently prints the communications, applies Intelligent Mail Barcode information, prepares and stuffs the materials into envelopes, and either mails the items using meters leased from its mailing vendor, Pitney Bowes or palletizes the larger mailings for delivery to Pitney Bowes for placement into the mail stream. Many of these mail jobs include hundreds if not thousands of individual mailings.

39.    During processing, Fiserv uses its internal "Jets" program to weigh and track the standard postal rates that would apply to each mailing.

40.    Palletized mailings are provided to Pitney Bowes where they are pre-sorted and delivered into the USPS mailing system.

41.    Fiserv falsely represents to USPS, either directly or through Pitney Bowes or others, that the mailings meet the Move Update standard by virtue of use of the NCOA$^{\text{Link}}$ system.

42.    Fiserv improperly certifies and then either pays discounted mailing rates directly to USPS or is charged by Pitney Bowes at discounted mailing rates. Such billings are reported back to Fiserv on documents such as a "DF Works Report," which shows the discounted mailing rates actually paid for various mailings.

43.    According to its website, Fiserv Output Solutions mails 3.5 billion customer communications annually.

**D. Fiserv's Knowing Failure to Comply with USPS discount requirements.**

44.    Despite its knowledge of the NCOA$^{\text{Link}}$, Fiserv maintains a pattern and practice of actions that fail to meet NCOA$^{\text{Link}}$ requirements including, but not limited to:

a. Failing to obtain unique PAFs from clients and/or provide PAFs to Licensees for each mailing list and, rather, operating using no PAF, generic and/or expired PAFs and/or PAFs executed using the electronic signature of a former employee;

b. Failing to provide mailing list owner clients with the required NCOA$^{Link}$ Information Package;

c. Failing to provide mailing list owners with processing summary reports; and/or

d. Failing to provide all mailing list owners with file level reports, but rather offering that information as optional in its service contracts.

45.    Relator was first engaged as a contractor for Fiserv Output Solutions in 2014, eventually becoming a fulltime employee.

46.    In 2018, Relator began working on a project to build the NCOA$^{Link}$ process into Fiserv's Plastics segment.

47.    Relator began investigating the process used by the Print segment, which had utilized NCOA processing for years.

48.    In early April 2018, Relator became aware that Fiserv did not have a process in place for obtaining required annual certifications for PAF forms. Relator discussed this issue with management.

49.    On April 27, 2018, Fiserv's Vice President of Postal Strategy circulated an internal email entitled "Postal PAF Compliance" wherein he noted that "USPS has no interest in retiring the [PAF] process at this time, and are in fact, starting to do some random audits." Fiserv management discussed the need for a project to resolve PAF non-compliance issues.

50.   On April 30, 2018, Relator was informed by Fiserv's Vice-President of Postal Strategy that the focus of efforts related to PAFs within Fiserv was to "get in compliance with processes that are mandatory to get postage discounts."

51.   In August, 2018, Relator discovered that Fiserv purported to use a single generic PAF form for all NCOA$^{Link}$ queries and was not obtaining or maintaining the required individual PAFs for each client mailing list it was servicing.

52.   Relator undertook the project throughout 2018 and early 2019 including investigating vendors to facilitate PAF tracking and renewal, outlining processes and presenting to Fiserv management regarding the PAF issue and possible solutions.

53.   For example, Relator prepared a presentation entitled PAF Remediation Project Review dated December 4, 2018. The presentation identified Fiserv's current lack of compliance with PAF requirements, proposed solutions including obtaining a "signed PAF for all clients utilizing NCOA to prevent USPS compliance issues and negative financial implications," and provided necessary next steps.

54.   Relator presented this information regarding Fiserv's violations and potential resolutions to Fiserv management including Fiserv Output Solutions' president.

55.   Although Fiserv recognized the PAF issue was a compliance problem related to postal discounts and needed to be addressed, no funding was provided to implement corrections and no steps were taken to pay the government for wrongly withheld postage.

56.   Relator was eventually given verbal instructions by the Senior Leadership Team in or about April 2019 to discontinue the project due to a potential merger with another service provider, First Data.

57.   Fiserv and First Data completed their merger on July 19, 2019.

11

58.     The improper PAF issue was raised again post-merger.

59.     On or about November 15, 2019, Relator created an overview presentation related to mail services wherein she noted that "[l]ack of centralized product owner has created lack of process around vendor management, internal process, product standards and accountability to remain current on USPS Regulations and Compliance." Relator noted that captured reduced postal rates estimated to be "roughly $48-50 Million per year."

60.     Even in instances where Fiserv appeared to obtain PAF forms, they did so improperly.

61.     On April 13, 2020, Relator notified the Vice President of Postal Strategy that a former employee's electronic signature was being used on the PAF forms to the extent they were signed by clients despite the fact that the employee no longer worked with Fiserv. The Vice President of Postal Strategy acknowledged that Fiserv should not use the former employee's signature on PAF forms.

62.     Despite this acknowledgment, to the very limited extent PAF forms existed, they continued to be signed by Fiserv using the former employee's electronic signature. Those forms include PAFs for a bank executed on July 16, 2020 and another bank executed on October 6, 2020.

63.     Fiserv's Director of Postal Relations recognized that Fiserv was still delivering mail that was ineligible for postal discounts. On June 10, 2020, he circulated an email to numerous Fiserv employees stating that "[i]n order to avoid being out of compliance with the USPS we need to turn off using the NCOA$^{Link}$ unless we can get a signature [on a PAF]." He further advised that Fiserv "forgo the postage discounts and ask [Pitney Bowes] to full rate these accounts until we can get a signature." He also asked what needed to be done to notify Pitney Bowes of non-compliant mail being sent to them for delivery into the postal system.

12

64.     On June 16, 2020, Fiserv's Director of Postal Relations sent another email to numerous Fiserv employees noting that the PAF was a required form by the USPS necessary "to stay compliant with the Privacy Act of 1974." Fiserv's Director of Postal Relations noted that it was necessary to discuss who would sign PAF forms going forward and that there were currently forms that needed signatures.

65.     On October 9, 2020, Relator notified multiple individuals within Fiserv that PAF forms were still being used that were purportedly executed by Fiserv by application of an electronic signature of a former employee. The former employee had not worked at Fiserv for months prior to this time and Relator notified others that "[w]e probably should not be using his signature."

66.     For example, Fiserv purported to obtain a PAF for and insurance company dated October 14, 2020. The PAF was purportedly executed on behalf of Fiserv as the Licensee via the electronic signature of the former employee. The same PAF was purported executed on behalf of Fiserv as a list administrator via the electronic signature of the former employee.

67.     Similarly improperly signed PAFs were created with the former employee's electronic signature on behalf of a credit union on October 15, 2020; a bank on November 16, 2020 and another bank on December 1, 2020.

68.     On or about April 1, 2021, Relator's employment with Fiserv terminated. Upon information and belief, after the termination of Relator's employment and the cessation of her internal efforts devoted to securing or developing compliant practices, Fiserv ceased remediation efforts and continued to brazenly directly and indirectly enter mail into the mail-stream, through knowingly false statements directly and indirectly certifying compliance with NCOA[Link] without PAFs and/or through expired PAFs and/or through invalid PAFs, and continued to request, receive, and retain postage discounts they were not entitled to pursuant to "Move Update" standards.

13

**E. Injury Sustained by the United States of America.**

69.    Since January 27, 2019, the standard rate for first class domestic mail in the United States has been $0.55. See https://about.usps.com/who-we-are/postal-history/domestic-letter-rates-since-1863.htm (last visited July 23, 2021).

70.    Fiserv obtained improper postal discounts based on their improper use of the NCOA$^{Link}$ system and/or their improper certifications on numerous occasions. For example, all Statement Advantage clients' mailings contain personal identifying information and are, therefore, considered first class mail under USPS regulations. Regardless, Statement Advantage customer Doe Co. 1[1] (client number 92864) paid postage of only $.43 for a letter mailed on or about July 3, 2020 under job number 4471539. No PAF was on file for John Doe Co. 1 and, therefore, no Move Update discount was warranted. This resulted in an underpayment of postage of $.12.

71.    In the approximately one month period prior to July, 2020, Fiserv processed thousands of pieces of mail on behalf of Statement Advantage clients, all of which would be subject to first class mailing rates but, due to claimed postal discounts were actually mailed at average rates significantly *below* standard first class rates. These include, but are not limited to:

| CLIENT NAME | CLIENT NUMBER | NUMBER OF ENVELOPES | POSTAGE PAID | AVERAGE PER ENVELOPE |
|---|---|---|---|---|
| Doe Co. 1 | 92864 | 6,031 | $ 2,559.00 | $.4243 |
| Doe Co. 2 | 93394 | 2,904 | $ 1,230.24 | $.4236 |
| Doe Co. 3 | 93391 | 21,866 | $ 9,328.17 | $.4266 |
| Doe Co. 4 | 93390 | 43,995 | $ 18,811.91 | $.4276 |
| Doe Co. 5 | 93378 | 24,515 | $ 10,499.38 | $.4283 |

---

[1] To preserve the confidentiality of non-party customers of Fiserv, Plaintiff identifies companies by "Doe Co." designations but includes the internal Fiserv customer identification number. Defendant therefore has sufficient information regarding these customers to investigate and respond to Plaintiff's allegations.

| Doe Co. 6 | 93376 | 7,858 | $ | 3,353.20 | $.4267 |
|---|---|---|---|---|---|
| Doe Co. 7 | 93374 | 46,747 | $ | 19,761.32 | $.4227 |
| Doe Co. 8 | 93370 | 7,405 | $ | 3,146.03 | $.4249 |
| Doe Co. 9 | 93361 | 4,436 | $ | 1,909.34 | $.4304 |
| Doe Co. 10 | 93353 | 3,614 | $ | 1,532.57 | $.4241 |
| Doe Co. 11 | 93337 | 8,006 | $ | 3,418.92 | $.4270 |
| Doe Co. 12 | 93335 | 11,379 | $ | 4,837.66 | $.4251 |
| Doe Co. 13 | 93332 | 4,056 | $ | 1,734.76 | $.4277 |
| Doe Co. 14 | 93287 | 22,407 | $ | 9,468.54 | $.4226 |
| Doe Co. 15 | 93280 | 2,060 | $ | 882.85 | $.4286 |
| Doe Co. 16 | 93274 | 17,122 | $ | 7,249.96 | $.4234 |
| Doe Co. 17 | 93268 | 2,303 | $ | 1,013.52 | $.4401 |
| Doe Co. 18 | 93237 | 833 | $ | 378.65 | $.4546 |
| Doe Co. 19 | 93235 | 2,859 | $ | 1,239.38 | $.4335 |
| Doe Co. 20 | 93224 | 13,339 | $ | 5,960.33 | $.4468 |
| Doe Co. 21 | 93221 | 9,182 | $ | 3,902.67 | $.4250 |
| Doe Co. 22 | 93220 | 36,903 | $ | 15,623.02 | $.4234 |
| Doe Co. 23 | 93218 | 18,444 | $ | 7,890.77 | $.4278 |
| Doe Co. 24 | 93212 | 13,494 | $ | 5,758.61 | $.4268 |
| Doe Co. 25 | 93196 | 804 | $ | 348.82 | $.4339 |
| Doe Co. 26 | 93181 | 15,866 | $ | 6,795.35 | $.4283 |
| Doe Co. 27 | 93179 | 5,204 | $ | 2,223.65 | $.4273 |
| Doe Co. 28 | 93159 | 27,777 | $ | 11,836.04 | $.4261 |

15

| Doe Co. 29 | 93145 | 6,013 | $ | 2,579.64 | $.4290 |
| Doe Co. 30 | 93132 | 10,105 | $ | 4,357.28 | $.4312 |
| Doe Co. 31 | 93119 | 6,092 | $ | 2,597.33 | $.4264 |
| Doe Co. 32 | 93105 | 3,594 | $ | 1,551.43 | $.4317 |
| Doe Co. 33 | 93098 | 5,276 | $ | 2,261.91 | $.4287 |
| Doe Co. 34 | 93097 | 4,409 | $ | 1,895.14 | $.4298 |
| Doe Co. 35 | 93093 | 17,894 | $ | 7,662.43 | $.4282 |
| Doe Co. 36 | 93081 | 9,501 | $ | 4,030.39 | $.4242 |
| Doe Co. 37 | 93050 | 4,810 | $ | 2,036.82 | $.4235 |
| Doe Co. 38 | 93043 | 8,519 | $ | 3,647.63 | $.4282 |
| Doe Co. 39 | 93039 | 154,311 | $ | 65,408.73 | $.4239 |
| Doe Co. 40 | 93022 | 7,257 | $ | 3,135.45 | $.4321 |
| Doe Co. 41 | 93012 | 6,982 | $ | 2,975.35 | $.4261 |
| Doe Co. 42 | 93010 | 46,838 | $ | 19,880.94 | $.4245 |
| Doe Co. 43 | 93007 | 75,696 | $ | 31,951.85 | $.4221 |
| Doe Co. 44 | 93001 | 7,822 | $ | 3,346.62 | $.4278 |
| Doe Co. 45 | 92997 | 25,935 | $ | 11,050.37 | $.4261 |
| Doe Co. 46 | 92971 | 6,436 | $ | 2,871.51 | $.4462 |
| Doe Co. 47 | 92967 | 6,062 | $ | 2,721.16 | $.4489 |
| Doe Co. 48 | 92947 | 12,856 | $ | 5,446.73 | $.4237 |
| Doe Co. 49 | 92931 | 3,257 | $ | 1,386.38 | $.4257 |
| Doe Co. 50 | 92927 | 10,555 | $ | 4,531.95 | $.4294 |
| Doe Co. 51 | 92924 | 10,882 | $ | 4,743.77 | $.4359 |

| Doe Co. 52 | 92922 | 1,706 | $ | 731.47 | $.4288 |
|---|---|---|---|---|---|
| Doe Co. 53 | 92915 | 4,085 | $ | 1,740.91 | $.4262 |
| Doe Co. 54 | 92903 | 1,946 | $ | 879.97 | $.4522 |
| Doe Co. 55 | 92892 | 6,792 | $ | 2,930.30 | $.4314 |
| Doe Co. 56 | 92889 | 1,747 | $ | 761.29 | $.4358 |
| Doe Co. 57 | 92870 | 9,684 | $ | 4,107.31 | $.4241 |
| Doe Co. 58 | 92863 | 7,524 | $ | 3,206.33 | $.4261 |
| Doe Co. 59 | 92862 | 9,266 | $ | 3,947.19 | $.4260 |
| Doe Co. 60 | 92855 | 13,011 | $ | 5,582.82 | $.4291 |

72.     Upon information and belief, all of the Doe Co. clients referenced in Paragraph 60—which are only a very small sampling of the multitude of clients that had postage handled by Fiserv in a similar manner—had NCOA as a service included in their service contracts.  None of the Doe Co. clients had valid PAFs on file at the time of these mailings and were, therefore, not entitled to Move Update postal discounts.

73.     As a result of the improper discounts set forth in Paragraph 70 above, standing alone, the USPS was knowingly and improperly paid approximately $109,896 less than would be due for full first-class rates of $.55 per mailing.

74.     Upon information and belief, Fiserv's knowing false claims and certifications for postal discounts have caused the USPS to lose very substantial sums of money every year over multiple years.

## COUNT I – VIOLATION OF FALSE CLAIMS ACT

75.     Plaintiff hereby incorporates paragraphs 1 through 74 as if fully set forth herein.

17

76.    Fiserv's claims and/or improper certifications to the USPS that they were entitled to discounted postal rates, made either directly to USPS or caused to be made by their mailing vendor Pitney Bowes or others, were false statements in that they represented compliance with Move Update standards through use of the NCOA$^{Link}$ system. In actuality, Fiserv knowingly failed to comply with NCOA$^{Link}$ requirements including failing to obtain PAFs from customers and/or using PAFS that were generic, outdated and/or executed with an electronic signature from an individual who was not then employed by Fiserv.

77.    Fiserv was aware that its mailings did not satisfy NCOA$^{Link}$ requirements, were not in compliance with the Move Update standards and not eligible for reduced postal rates.

78.    Despite this knowledge, Fiserv made, or caused to be made, false statements and/or certifications regarding its entitlement to postal rate discounts with the intent of decreasing payments to USPS below what was lawfully owed.

79.    The misrepresentations to USPS were material in that USPS would have required payment of non-discounted postal rates absent Fiserv's misrepresentations of having taken required actions and steps and met required standards to secure entitlement to such discounts.

80.    As a result of Fiserv's knowing misrepresentations to decrease their obligation to the USPS and its knowing retention of postage underpayments, the United States of America received millions of dollars less in postal payments than it was owed.

WHEREFORE, Relator, on behalf of the United States of America, respectfully requests this Court find that Defendant has damaged the United States of America by virtue of its failure to pay amounts owed for services provided by the USPS thereby violating the False Claims Act; that Defendant pay the United States of America damages, including, but not limited to, actual damages in the amount of the difference in postal rates that should have been paid by Defendant and the

amount actually paid by Defendant based on improper claims of postal discounts, civil penalties in the amount of three times actual damages suffered by the United States of America, attorneys' fees and costs, pre-judgment and post-judgment interest and for such other and further relief as this Court deems just and proper. Relator further requests a fair and reasonable award for her contribution to the recovery of the United States Government pursuant to 31 U.S.C. § 3730(d).

Respectfully submitted,

GRAY, RITTER & GRAHAM, P.C.
Morry S. Cole, #46294 MO
Jason D. Sapp, #58511 MO
701 Market Street, Suite 800
St. Louis, MO 63101-1826
Phone: (314) 241-5620
Fax: (314) 241-4140
mcole@grgpc.com
jsapp@grgpc.com

LAW OFFICES OF JASON M. FINKES, LLC
Jason M. Finkes, #65903MO
8112 Maryland Ave., Suite 400
Clayton, MO  63105
Phone: (314) 312-3473
jason@finkeslegal.com

**Attorneys for Relator Deborah Lynn Getchman**

19